IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Jorge Oliverio Moran-Can,<br><br>　　　　　　Defendant. | No. CR-22-01661-TUC-SHR (LCK)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court are Defendant's motions to suppress, one based on involuntariness (Doc. 37) and one based on a violation of *Miranda* (Doc. 38). The government responded (Docs. 45, 46), and Defendant filed replies (Docs. 48, 49). This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 57.6. Evidence and argument were heard on January 11, 2023.[1] (Doc. 58.) This matter was submitted following oral argument at the conclusion of the hearing. Defendant alleges that his statements were obtained in violation of *Miranda* and involuntary. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, grant, in part, and deny, in part, Defendant's motions to suppress.

**I. FACTUAL BACKGROUND**

In a Superseding Indictment, Defendant Jorge Oliverio Moran-Can was charged with two counts of assault on a federal officer, in violation of 18 U.S.C. §§ 111 (a) & (b),

---

[1] "RT" refers to the Reporter's Transcript of the evidentiary hearing. (Doc. 63.)

and one count of illegal entry, in violation of 18 U.S.C. § 1325(a). (Doc. 26.) The government subsequently dismissed the illegal entry count. (Docs. 56, 57.)

Border Patrol Agent Blaze Goldhahn has been an agent for approximately three and a half years, all of which have been served in the Tucson sector. (RT 1/11/23 at 9.) On July 3, 2022, at 6:15 a.m., BPA Goldhahn was working in uniform when he received information over the radio that a group of four suspected undocumented noncitizens were at the base of the Spine Trail. (*Id.* at 10, 11.) BPA Goldhahn drove from a few miles away and then began walking up the ridgeline. (*Id.* at 11-12.) He saw a group a couple hundred yards ahead of him. (*Id.* at 13.) It took him close to three hours to cover the two miles that brought him within contact distance of the four suspects. (*Id.*) At that point, other agents were at least a one-and-a-half-hour hike away from his location. (*Id.* at 19.)

BPA Goldhahn came upon Defendant and two others at the base of a rock ledge. (*Id.* at 14.) The agent was about 6 foot 3 inches tall, several inches taller than Defendant, and weighed 175 pounds. (*Id.* at 36-37.) In Spanish, he identified himself and directed the individuals not to move. (*Id.* at 16.) The agent had his baton out because he mistakenly thought Defendant was part of the group that had failed to obey his commands earlier and, due to his vulnerable downhill position from Defendant, he wanted to ensure compliance. (*Id.* at 17.) The other two individuals ran off, and the agent stayed with Defendant. (*Id.* at 17-18.) Because Defendant was being compliant, BPA Goldhahn returned his baton to its pouch on his belt. (*Id.* at 18, 31.)

Next, BPA Goldhahn moved to handcuff Defendant, with the intent of arresting him for being in the country illegally. (*Id.* at 37-38.) According to the agent's testimony at the preliminary hearing, Defendant then shoved BPA Goldhahn until the two of them ended up falling down the hillside. (Doc. 16 at 10-14, 20-22.)[2] While they were tumbling down the steep, rocky incline, BPA Goldhahn told Defendant, "[i]f you don't stop resisting, if you don't stop fighting, I will kill you." (RT 1/11/23 at 40, 49-50.) BPA Goldhahn stated

---

[2] In summarizing the facts underlying his motions, Defendant relied upon this portion of the preliminary hearing transcript. (Doc. 37 at 3; Doc. 38 at 3.) He also attached that transcript as an exhibit to both suppression motions. (Doc. 37, Ex. B; Doc. 38, Ex. B.)

this in an effort to obtain compliance from Defendant. (*Id.* at 44.) When Defendant landed on top of the agent, BPA Goldhahn used a hold he learned in Brazilian jiu-jitsu that involved putting a leg over Defendant's shoulder and grabbing that leg with his opposite hand under the Defendant's arm. (*Id.* at 40-41.) While in that hold, Defendant stated in Spanish that he surrendered. (*Id.* at 19-20, 44.) BPA Goldhahn maintained the hold for 20-30 seconds total. (*Id.* at 45.) After approximately 10-15 seconds, the agent modified the hold by loosening his leg and using one hand to reach and secure handcuffs on Defendant. (*Id.* at 45-46.)

BPA Goldhahn then asked Defendant his citizenship, where he was born, if he had documents to be in the United States legally, and when he had crossed the border. (*Id.* at 20.) Defendant responded that he was born in, and a citizen of, Guatemala, that he did not have legal documents to be in the country, and he had crossed the border earlier that day. (*Id.* at 22.) The agent testified that he asked these immigration status questions of everyone he apprehended that appeared to be an undocumented citizen, which he determined based on location, proximity to the border, whether they were wore camouflage or carried backpacks, and if they tried to evade him. (*Id.* at 21-22.) The only other question the agent asked prior to beginning their hike was whether Defendant was travelling with a scout or guide, to which Defendant responded no. (*Id.* at 23, 29, 32.)

Within about five minutes of those immigration questions, the agent lifted his left pant leg to inspect an injury. (*Id.* at 25-26.) His intent was to evaluate whether it needed any care prior to hiking out of the area. (*Id.* at 27.) BPA Goldhahn did not speak during this process, but Defendant said that he was sorry. (*Id.*) Before beginning the hike, Defendant pleaded repeatedly with the agent to let him go. (*Id.* at 28, 47.) Defendant asked for forgiveness and stated that, if let go, he would return to Mexico. (*Id.* at 28.) These statements were initiated by Defendant; the agent responded that there was no chance he was letting him go, and he was taking him to the station. (*Id.* at 28, 31-32, 50-51.) BPA Goldhahn also stated that he would not let Defendant go because he had fought with him. (*Id.* at 47.) Defendant apologized for fighting with him. (*Id.* at 48-49, 50.)

BPA Goldhahn led them on a hike out to a parking area where a transport vehicle could meet them. (*Id.* at 24.) Defendant remained in handcuffs for the two-mile hike out of the mountains. (*Id.* at 20, 24.) While hiking, the agent did not ask Defendant any questions related to his earlier actions. (*Id.* at 29.) He initiated conversation only about the hike and Defendant's ability to handle it. (*Id.* at 29-30.) Defendant did not initiate any conversation during the hike about the alleged assault. (*Id.* at 30.)

The government conceded that any statements Defendant made to BPA Bennett, who met Defendant when he reached the parking area for transport, would not be introduced by the government. (Doc. 45 at 4; RT 1/11/23 at 4.) The government also conceded that any statements Defendant made relevant to his immigration status, whether to BPA Goldhahn or BPA Garcia would not be part of its case in chief. (RT 1/11/23 at 4-5.) However, the government preserved the possibility that it would use Defendant's statements regarding his citizenship and crossing into the United States, that he made to BPA Goldhahn, for impeachment. (*Id.* at 5-7.)

## II. DISCUSSION

### A.   *Miranda*

Defendant made several statements to BPA Goldhahn that were not related to his immigration status. While the agent had him in a hold on the hillside, Defendant stated that he surrendered. Subsequently, after Defendant had answered several questions regarding his immigration status, Defendant repeatedly apologized and asked the agent to let him go. These statements were not made in response to any question posed by BPA Goldhahn.

The government contends these statements may be introduced in its case in chief. The Government is precluded from using statements arising from custodial interrogation absent the provision of warnings regarding the person's rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (defining custody to encompass when a person has been "deprived of his freedom of action in any significant way."); *United States v. Patane*, 542 U.S. 630, 631 (2004) ("the Miranda rule creates a presumption of coercion in custodial interrogations, in the absence of specific warnings, that is generally irrebuttable for

purposes of the prosecution's case in chief."). The government conceded that Defendant was in custody as of the time BPA Goldhahn placed him in handcuffs and the agent did not advise him of his rights under *Miranda*. Therefore, Defendant was in custody at the time he stated his apologies and requested that the agent let him go. Arguably, he was not in custody at the time he stated, "I surrender" in Spanish. Regardless, whether *Miranda* warnings were required prior to these statements is easily determined by evaluating whether Defendant was interrogated.

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). "The fundamental import of the privilege [against self-incrimination] while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." *Miranda*, 384 U.S. at 478.

The Court finds none of Defendant's non-immigration statements to BPA Goldhahn were made in response to interrogation. When Defendant stated that he surrendered, the agent's preceding actions and words were designed to obtain physical compliance to affect the arrest. The agent had no reason to know they were likely to elicit an incriminating response. Next, Defendant contends that when the agent checked the injury to his knee, he compelled Defendant to speak. Although revealing his injured knee may have amounted to "subtle compulsion," the agent silently examining his injury was not an action that he should have known was likely to elicit an incriminating response by Defendant. *Id.* at 303 (finding subtle compulsion does not equate to interrogation). Finally, Defendant argues that when BPA Goldhahn stated that he would not let Defendant go because he had fought with the agent, that also amounted to interrogation. The testimony at the hearing was that Defendant initiated the conversation by asking BPA Goldhahn to let him go. When the agent responded with a single statement, not a question, as to why he would not let him go, he had no reason to know that was likely to elicit an incriminating response. These

statements all were spontaneous, and *Miranda* does not apply. *See Cox v. Del Papa*, 542 F3d 669, 675 (9th Cir. 2008).

### B. Voluntariness

With respect to voluntariness, the Court evaluates Defendant's spontaneous statements. It also evaluates his answers to Defendant Goldhahn's immigration status questions, which the government argues may be offered for the purpose of impeachment.

The test for determining the voluntariness of a suspect's confession is whether, considering all the circumstances, the government obtained the statement by physical or psychological coercion or by inducement so that the suspect's will was overcome. *See United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)). Courts consider "the combined effect of the entire course of the officer's conduct upon the defendant." *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002) (citing *United States v. Polanco*, 93 F.3d 555, 560 (9th Cir. 1996)). The circumstances to be considered include: (1) whether there was police coercion; (2) the length of the interrogation, its location, and its continuity; (3) whether police advised the suspect of his rights; and (4) whether there were any direct or implied promises of a benefit. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). Courts also consider the defendant's age, education, the nature of any questioning, and the use of any physical punishment such as the deprivation of food or sleep to determine voluntariness. *See United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). A statement will be found involuntary if agents "use coercive means to undermine the suspect's ability to exercise his free will." *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999). Coercive action by the police is a prerequisite to finding that a statement is involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "In short the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes*, 373 U.S. at 513-14.

Defendant contends that all of his statements were coerced based on BPA Goldhahn's physical intimidation of him, including his larger size, display of his baton, threat to kill him, and use of a hold move when trying to handcuff him. According to the evidence, BPA Goldhahn used physical intimidation and a threat solely because Defendant resisted arrest and struggled with the agent. Once the agent placed handcuffs on Defendant, he did not exert any further physical coercion against him.

### 1. Spontaneous Statements

As found above, Defendant's spontaneously-made statements were not the product of interrogation. For that reason, the Court determined a *Miranda* warning was not required. The first statement made by Defendant was, "I surrender," offered while BPA Goldhahn had him in a hold, prior to handcuffing him. Because this statement was the direct result of physical intimidation, the Court finds it was not voluntary and not admissible.

Next, the Court evaluates Defendant's subsequent statements, in which he apologized and asked the agent to let him go. Because BPA Goldhahn ceased physical intimidation as soon as he gained sufficient control of Defendant to affect an arrest, the Court finds those actions did not coerce Defendant to make his statements. The physical altercation between the two was instigated by Defendant. The agent's actions did not involve unprovoked violence, rather, they were a response to Defendant actively resisting arrest. The evidence suggests Defendant apologized freely with the intention of persuading the agent to release him. BPA Goldhahn did not promise Defendant any benefit for making a statement, and he did not inflict any punishment to obtain the statements. The Court finds these statements were voluntary and admissible by the government in its case in chief.

### 2. Statements Regarding Immigration Status

The government reserved its right to use, as impeachment, Defendant's statements to BPA Goldhahn regarding his immigration status. For purposes of impeachment, the Court need only evaluate whether a statement was voluntary. *Pollard*, 290 F3d at 1033. Statements taken in violation of *Miranda* may be used for impeachment, if voluntary;

- 7 -

however, involuntary statements cannot be used at trial for any purposes. *Id.* (citing *Harris v. New York*, 401 U.S. 222, 224-26 (1971); *Michigan v. Harvey*, 494 U.S. 344, 351 (1990)); *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978). Excluding testimony from the government's case in chief based on a *Miranda* violation is intended to deter improper police conduct. *Harris*, 401 U.S. at 224-25. But the protections of *Miranda* do not extend to allow a defendant to commit perjury at trial free from impeachment based on prior statements. *Id.* at 225-26.

As discussed above, BPA Goldhahn asked Defendant about his citizenship and legal right to be in the United States. The agent had ceased the use of physical force against Defendant as soon as he gained control of him and affected his arrest. There was no reason to believe he would use further force, absent Defendant initiating a physical conflict. BPA Goldhahn did not promise Defendant any benefit for answering his questions, and he did not inflict any punishment to obtain the responses. Considering all the circumstances, the Court finds that Defendant's answers to BPA Goldhahn's questions regarding his immigration status were not coerced but voluntarily given. Therefore, they are admissible for purposes of impeachment.

### III. RECOMMENDATION

It is recommended that, after its independent review of the record, the District Court grant, in part, and deny, in part, Defendant's motions to suppress. Specifically, it is recommended that the Court grant Defendant's Motion to Suppress Statements for Involuntariness (Doc. 37), with respect to all Defendant's statements to BPA Bennett; all Defendant's statements to BPA Garcia;[3] and Defendant's statement in Spanish of, "I surrender," to BPA Goldhahn. It is further recommended that the Court grant Defendant's Motion to Suppress Statements in Violation of *Miranda* (Doc. 38), with respect to

---

[3] Defendant's counsel stated that immigration Form I-213 was completed by BPA David Garza, and they are not aware of statements being made to an agent Garcia. (Doc. 48 at 1-2.) Due to redactions, it is difficult to read the agent's last name on the I-213. (Doc. 37, Ex. D.) Based on the government's concession, the Court recommends suppressing any statements made by Defendant after BPA Goldhahn relinquished custody of him, whether to David Garcia, David Garza, or another unidentified agent.

Defendant's statements to BPA Bennett and BPA Garcia. *See supra* note 3. The motions should be denied in all other respects.

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. A party may respond to the other party's objections within fourteen days. No reply brief shall be filed on objections unless leave is granted by the district court. If objections are not timely filed, they may be deemed waived.

Dated this 6th day of February, 2023.

Honorable Lynnette C. Kimmins
United States Magistrate Judge