**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Jorge Oliverio Moran-Can,<br><br>Defendant. | No. CR-22-01661-001-TUC-SHR (LCK)<br><br>**Order Accepting Magistrate Judge's Report and Recommendation** |

Pending before the Court is a Report and Recommendation ("R&R") (Doc. 69) issued by United States Magistrate Judge Lynnette C. Kimmins recommending the Court grant in-part and deny in-part Defendant's Motions to Suppress. (Docs. 37, 38.) Defendant filed an Objection (Doc. 76). For the reasons below, the R&R is accepted over Defendant's Objection.

## I.     STANDARD OF REVIEW

When reviewing a magistrate judge's R&R, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "[T]he district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (emphasis in original). However, objections to R&Rs "are not to be construed as a second opportunity to present the arguments already considered by the Magistrate Judge." *Betancourt v. Ace*

*Ins. Co. of Puerto Rico*, 313 F. Supp.2d 32, 34 (D.P.R. 2004); *see also Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) ("The purpose of the Federal Magistrates Act is to relieve courts of unnecessary work" and "[t]here is no increase in efficiency, and much extra work, when a party attempts to relitigate every argument which it presented to the Magistrate Judge.").

## II.   BACKGROUND

The Court adopts the following unobjected-to facts as set forth in the R&R:

> In a Superseding Indictment, Defendant Jorge Oliverio Moran-Can was charged with two counts of assault on a federal officer, in violation of 18 U.S.C. §§ 111 (a) & (b), and one count of illegal entry, in violation of 18 U.S.C. § 1325(a). (Doc. 26.) The government subsequently dismissed the illegal entry count. (Docs. 56, 57.)
>
> Border Patrol Agent Blaze Goldhahn has been an agent for approximately three and a half years, all of which have been served in the Tucson sector. (RT 1/11/23 at 9.)[1] On July 3, 2022, at 6:15 a.m., BPA Goldhahn was working in uniform when he received information over the radio that a group of four suspected undocumented noncitizens were at the base of the Spine Trail. (*Id.* at 10, 11.) BPA Goldhahn drove from a few miles away and then began walking up the ridgeline. (*Id.* at 11-12.) He saw a group a couple hundred yards ahead of him. (*Id.* at 13.) It took him close to three hours to cover the two miles that brought him within contact distance of the four suspects. (*Id.*) At that point, other agents were at least a one-and-a-half-hour hike away from his location. (*Id.* at 19.)
>
> BPA Goldhahn came upon Defendant and two others at the base of a rock ledge. (*Id.* at 14.) The agent was about 6 foot 3 inches tall, several inches taller than Defendant, and weighed 175 pounds. (*Id.* at 36-37.) In Spanish, he identified himself and directed the individuals not to move. (*Id.* at 16.) The agent had his baton out because he mistakenly thought Defendant was part of the group that had failed to obey his commands earlier and, due to his vulnerable downhill position from Defendant, he wanted to ensure compliance. (*Id.* at 17.) The other two individuals ran off, and the agent stayed with Defendant. (*Id.* at 17-18.) Because Defendant was being compliant, BPA Goldhahn returned his baton to its pouch on

---

[1] "RT" refers to the Reporter's Transcript of the evidentiary hearing. (Doc. 63.)

his belt. (*Id.* at 18, 31.)

Next, BPA Goldhahn moved to handcuff Defendant, with the intent of arresting him for being in the country illegally. (*Id.* at 37-38.) According to the agent's testimony at the preliminary hearing, Defendant then shoved BPA Goldhahn until the two of them ended up falling down the hillside. (Doc. 16 at 10-14, 20-22.)[2] While they were tumbling down the steep, rocky incline, BPA Goldhahn told Defendant, "[i]f you don't stop resisting, if you don't stop fighting, I will kill you." (RT 1/11/23 at 40, 49-50.) BPA Goldhahn stated this in an effort to obtain compliance from Defendant. (*Id.* at 44.) When Defendant landed on top of the agent, BPA Goldhahn used a hold he learned in Brazilian jiu-jitsu that involved putting a leg over Defendant's shoulder and grabbing that leg with his opposite hand under the Defendant's arm. (*Id.* at 40-41.) While in that hold, Defendant stated in Spanish that he surrendered. (*Id.* at 19-20, 44.) BPA Goldhahn maintained the hold for 20-30 seconds total. (*Id.* at 45.) After approximately 10-15 seconds, the agent modified the hold by loosening his leg and using one hand to reach and secure handcuffs on Defendant. (*Id.* at 45-46.)

BPA Goldhahn then asked Defendant his citizenship, where he was born, if he had documents to be in the United States legally, and when he had crossed the border. (*Id.* at 20.) Defendant responded that he was born in, and a citizen of, Guatemala, that he did not have legal documents to be in the country, and he had crossed the border earlier that day. (*Id.* at 22.) The agent testified that he asked these immigration status questions of everyone he apprehended that appeared to be an undocumented citizen, which he determined based on location, proximity to the border, whether they [] wore camouflage or carried backpacks, and if they tried to evade him. (*Id.* at 21-22.) The only other question the agent asked prior to beginning their hike was whether Defendant was travelling with a scout or guide, to which Defendant responded no. (*Id.* at 23, 29, 32.)

Within about five minutes of those immigration questions, the agent lifted his left pant leg to inspect an injury. (*Id.* at 25-26.) His intent was to evaluate whether it needed any care prior to hiking out of the area. (*Id.* at 27.) BPA Goldhahn did not speak during this process, but Defendant said that he

---

[2] In summarizing the facts underlying his motions, Defendant relied upon this portion of the preliminary hearing transcript. (Doc. 37 at 3; Doc. 38 at 3.) He also attached that transcript as an exhibit to both suppression motions. (Doc. 37, Ex. B; Doc. 38, Ex. B.)

- 3 -

was sorry. (*Id.*) Before beginning the hike, Defendant pleaded repeatedly with the agent to let him go. (*Id.* at 28, 47.) Defendant asked for forgiveness and stated that, if let go, he would return to Mexico. (*Id.* at 28.) These statements were initiated by Defendant; the agent responded that there was no chance he was letting him go, and he was taking him to the station. (*Id.* at 28, 31-32, 50-51.) BPA Goldhahn also stated that he would not let Defendant go because he had fought with him. (*Id.* at 47.) Defendant apologized for fighting with him. (*Id.* at 48-49, 50.)

BPA Goldhahn led them on a hike out to a parking area where a transport vehicle could meet them. (*Id.* at 24.) Defendant remained in handcuffs for the two-mile hike out of the mountains. (*Id.* at 20, 24.) While hiking, the agent did not ask Defendant any questions related to his earlier actions. (*Id.* at 29.) He initiated conversation only about the hike and Defendant's ability to handle it. (*Id.* at 29-30.) Defendant did not initiate any conversation during the hike about the alleged assault. (*Id.* at 30.)

The government conceded that any statements Defendant made to BPA Bennett, who met Defendant when he reached the parking area for transport, would not be introduced by the government. (Doc. 45 at 4; RT 1/11/23 at 4.) The government also conceded that any statements Defendant made relevant to his immigration status, whether to BPA Goldhahn or BPA Garcia would not be part of its case in chief. (RT 1/11/23 at 4- 5.) However, the government preserved the possibility that it would use Defendant's statements regarding his citizenship and crossing into the United States, that he made to BPA Goldhahn, for impeachment. (*Id.* at 5-7.)

(Doc. 69 at 1–4.)

Defendant filed two motions to suppress: (1) seeking to suppress all statements in violation of *Miranda*; and (2) seeking to suppress all statements obtained involuntarily. (Docs. 37, 38.) After an evidentiary hearing on the motions, Judge Kimmins issued her R&R recommending the Court: (1) grant Defendant's Motion to Suppress Statements in Violation of *Miranda* with respect to Defendant's statements to Agent Bennett and Agent Garcia and (2) grant Defendant's Motion to Suppress Statements for Involuntariness "with respect to all Defendant's statements to [Agent] Bennett; all Defendant's statements to

[Agent] Garcia;[3] and Defendant's statement in Spanish of, 'I surrender,' to [Agent] Goldhahn." (Doc. 69 at 8–9.) Judge Kimmins recommended denying the motions in all other respects. (*Id.* at 9.)

For the first motion, Judge Kimmins found "none of Defendant's non-immigration statements to [Agent] Goldhahn were made in response to interrogation," Agent Goldhan had no reason to know his actions and words were likely to elicit an incriminating response, and *Miranda* did not apply because these statements were spontaneous. (Doc. 69 at 5–6.)

For the second motion, Judge Kimmins found the statement "I surrender" was involuntary because Defendant made this statement while Agent Goldhahn had him in a hold. (Doc. 69 at 7.) Judge Kimmins also found "Defendant's subsequent statements, in which he apologized and asked the agent to let him go" voluntary and admissible because Agent Goldhahn "ceased physical intimidation as soon as he gained sufficient control of Defendant to affect an arrest," "did not promise Defendant any benefit for making a statement, and he did not inflict any punishment to obtain the statements." (*Id.*) Lastly, Judge Kimmins found the statements regarding immigration status were voluntary and therefore admissible for impeachment purposes. (*Id.* at 7–9.)

Defendant filed an Objection focused solely on the statements he made to Agent Goldhahn which includes: immigration-related statements, non-specific apologies, requests to be let go, and the specific apology for fighting. (Doc. 76.) The Government filed a Response (Doc. 77). The Court will only address the statements contested in the Objection. *See Reyna-Tapia*, 328 F.3d at 1121.

### III. DISCUSSION

A. Motion to Suppress Based on *Miranda*

In his Objection, Defendant asserts the R&R fails to consider all the circumstances

---

[3]Judge Kimmins noted: "Defendant's counsel stated that immigration Form I-213 was completed by [Agent] David Garza, and they are not aware of statements being made to an [A]gent Garcia. (Doc. 48 at 1-2.) Due to redactions, it is difficult to read the agent's last name on the I-213. (Doc. 37, Ex. D.) Based on the government's concession, the Court recommends suppressing any statements made by Defendant after [Agent] Goldhahn relinquished custody of him, whether to David Garcia, David Garza, or another unidentified agent." (Doc. 69 at 8, n.8.)

surrounding his statements including his perception of Agent Goldhahn's actions and the effect those actions had on him. (Doc. 76 at 3.) According to Defendant, the R&R incorrectly concluded his statements were spontaneous because Agent Goldhahn should have known his actions would elicit incriminating statements. (*Id.* at 4.) Specifically, Defendant repeats his arguments about Agent Goldhahn displaying his knee injury and telling Defendant he would not let him go because he had fought with him.[4] (Doc. 76 at 3–5.)

The Government is precluded from using statements arising from custodial interrogation absent the provision of warnings regarding the person's rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (defining custody to encompass when a person has been "deprived of his freedom of action in any significant way.") Here, it is undisputed Defendant was in custody when he made the statements at issue and he was not read his *Miranda* rights. (Doc. 69 at 5; Doc. 45 at 4.) Therefore, the sole focus is on whether there was an interrogation.

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Although "[i]ndirect comments (or coercive actions)" can constitute interrogation for *Miranda* purposes, the standard for determining whether an officer's comments or actions constitutes this indirect sort of interrogation is "quite high." *United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000). "Because 'the police surely cannot be held

---

[4] Defendant attempts to bring up new arguments for the first time in his Objection relating to Agent Goldhahn: brandishing a baton, threatening to kill him, using a Brazilian Jiu-Jitsu-like hold on him, and eliciting incriminating statements from him relating to the crime of illegal entry in violation of his *Miranda* rights. (Doc. 76 at 3–5.) Defendant did not argue these facts were relevant to the *Miranda* analysis in his Motion to Suppress Statements in Violation of *Miranda* or when addressing this issue at the hearing before Judge Kimmins. (*See* Docs. 38, 48; RT 1/11/23 at 52–56.) Therefore, the Court will not consider these arguments here. *See Colby v. Herrick*, 849 F.3d 1273, 1279 (10th Cir. 2017) (new arguments and issues are waived when raised for first time in objecting to magistrate judge's recommendation).

- 6 -

accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.'" *Id.* (quoting *Innis,* 446 U.S. at 301–02).

Based on this record, the Court concludes Agent Goldhahn could not have known his words and conduct were "reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. Agent Goldhahn *silently* looked at his knee and did not accuse Defendant of anything while doing so. (RT 1/11/23 at 25–27.) This is distinguishable from the cases cited by Defendant where law enforcement more overtly accused the defendants of a crime. *See United States v. Brown*, 720 F.2d 1059, 1064 (9th Cir. 1983) (officer accused defendant of being a "pimp" and selling "dope to little black children); *United States v. Poole*, 794 F.2d 462, 466 (9th Cir. 1986) (officer showed defendant surveillance photos of a bank robbery and named defendant's suspected accomplice.) Furthermore, Agent Goldhahn told Defendant the reason he was not going to let him go in *response* to Defendant's request to be let go. (RT 1/11/23 at 47.) Based on the record, Defendant has not met the high burden of showing Agent Goldhahn should have known his questions were reasonably likely to elicit an incriminating response. *See Foster*, 227 F.3d at 1103. Instead, the record suggests Defendant spontaneously made these statements on his own.

B. Motion to Suppress Based on Involuntariness

In his Objection, Defendant asserts the same arguments made to Judge Kimmins: his statements were involuntary, and his will had been overborne because Agent Goldhahn had just used physical force against him and he believed Agent Goldhahn would kill him.[5] (Compare Doc. 76 at 6–8 *with* Doc. 37 at 5–7.) Specifically, Defendant references Agent Goldhahn brandishing a baton, threatening to kill him, using a Brazilian Jiu-Jitsu-like hold

---

[5]The only noticeable difference in argument is the addition of Agent Goldhahn saying he would not let Defendant go because he fought with him. (*See* Docs. 37, 49; RT 1/11/23 at 56–58.) As stated before, the Court will not consider new arguments raised for the first time in an objection. *See Colby*, 849 F.3d at 1279.

- 7 -

on him, and displaying his knee injury. (Doc. 76 at 6–8.) Defendant also references his inexperience with the United States justice system and his smaller size in comparison to Agent Goldhahn. (*Id.*)

The test for determining the voluntariness of a suspect's confession is whether, considering all the circumstances, the government obtained the statement by physical or psychological coercion or by inducement so that the suspect's will was overcome. *See United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing *Haynes v. Washington*, 373 U.S. 503, 513–14 (1963)). A court must consider the "the combined effect of the entire course of the officer's conduct upon the defendant." *Pollard v. Galaza*, 290 F.3d. 1030, 1033 (9th Cir. 2002). The circumstances to be considered include: (1) whether there was police coercion; (2) the length of the interrogation, its location, and its continuity; (3) whether police advised the suspect of his rights; and (4) whether there were any direct or implied promises of a benefit. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). Courts also consider: "a suspect's age, education, intelligence, physical health, and prior experience with the criminal system; the length, location, and conditions of detention; the length and nature of questioning; and the use by law enforcement of any threats, punishments, or inducements." *Bradford v. Davis*, 923 F.3d 599, 616 (9th Cir. 2019).

A statement "is involuntary only if the [government agents] use coercive means to undermine the suspect's ability to exercise his free will." *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999). Coercive action by the police is a prerequisite to finding a statement involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "In short, the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes*, 373 U.S. at 513 (internal citation omitted).

As Judge Kimmins explained, after the physical altercation initiated by Defendant ceased, Agent Goldhahn placed Defendant in handcuffs, and his subsequent actions did not constitute coercion. (Doc. 69 at 7–8.) Agent Goldhahn did not use his weapons, make any threats or promises, or inflict punishment to coerce Defendant. Agent Goldhahn did not

offer Defendant any benefit for answering and there was no reason to believe Agent Goldhahn would use physical force, absent Defendant initiating further physical contact. Therefore, the Court concludes Defendant's statements in question were voluntary.

Accordingly,

**IT IS ORDERED** Magistrate Judge Lynnette C. Kimmins's Report and Recommendation (Doc. 69) is **accepted** in its entirety.

**IT IS FURTHER ORDERED** Defendant's Motion to Suppress Statements in Violation of *Miranda* (Doc. 38) is **granted in-part** with respect to Defendant's statements to Agent Bennett and Agent Garcia, and is denied in all other respects.

**IT IS FURTHER ORDERED** Defendant's Motion to Suppress Statements for Involuntariness (Doc. 37) is **granted in-part** with respect to all Defendant's statements to Agent Bennett; all Defendant's statements to Agent Garcia; and Defendant's "I surrender" statement in Spanish to Agent Goldhahn; the motion is denied in all other respects.

Dated this 30th day of March, 2023.

Honorable Scott H. Rash
United States District Judge